399 P.2d 962

MINIDOKA COUNTY, Idaho, for the Use
and Benefit of DETWEILER BROS., INC.,
an Idaho corporation, Plaintiff-Respondent,

v.

L. H. KRIEGER, doing business under the
firm name and style of Krieger Construc-
tion Co., American Casualty Company, a
corporation, Defendants-Appellants,

and

Associated Specialties Co., a corporation, and
Alfred Thaxton, doing business under the
firm name and style of Thaxton Painting
Company, Defendants-Respondents.

AMERICAN CASUALTY COMPANY, a cor-
poration, Defendant and Third-Party
Plaintiff-Appellant,

v.

MINIDOKA COUNTY, Idaho, Plaintiff and
Third-Party Defendant-Respondent.

No. 9334.

Supreme Court of Idaho.

July 16, 1964.

On Rehearing March 23, 1965.

Bellwood & Goodman, Rupert, for appellant American Cas. Co.

Charles H. Creason, Rupert, for appellant L. H. Krieger.

Moffatt, Thomas, Barrett & Blanton, Boise, for appellant American Cas. Co., on appeal.

Benoit & Benoit, Twin Falls, for defendant Detweiler Bros., Inc.

Louis F. Racine, Jr., Pocatello, defendant for Associated Specialties Co.

Duffin & Duff, Rupert, for defendant Minidoka County.

Parsons, Smith & Snow, Burley, for respondent Alfred Thaxton.

the Surety; Associated Specialties Co., a corporation, as Associated; and Alfred Thaxton d/b/a Thaxton Painting Company as Thaxton.

SMITH, Justice.

Various parties will be referred to as follows: Minidoka County as the County; Detweiler Bros., Inc. as Detweiler; L. H. Krieger, d/b/a Krieger Construction Co. or Krieger Construction Company, Inc., a corporation sole, as Krieger; American Casualty Company as American Casualty or

Respondent Detweiler, in the name of the County, commenced this action May 9, 1961, seeking to recover $22,306.05, based upon its claim filed with the County for labor, materials and supplies, which Detweiler, a sub-contractor, furnished to appellant (defendant) Krieger, the general contractor, for use in the construction of a hospital building.[1] Detweiler brought the action against Krieger and Krieger's surety, American Casualty, on its Performance Bond,[2] and Payment Bond,[3] required

[1]. Under the original contract of July 1, 1959, L. H. Krieger Construction Co. contracted to construct a hospital building for Minidoka County for the contract price of $659,264. The contractor agreed to furnish a performance bond in an amount at least equal to 50% of the amount of the contract as security for the faithful performance of the contract; and to furnish a separate payment bond in an amount at least equal to 50% of the contract price as security for the payment of all persons furnishing labor and materials under the contract.

[2]. The condition of the Performance Bond reads:
"Now, therefore, if the principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the owner, with or without notice to the surety, and during the life of any guaranty required under the contract, and shall also well and truly per-

form and fulfill all the undertakings, covenants, terms, conditions and agreements of any and all duly authorized modifications of said contract that may hereafter be made, except that no change will be made which increases the total contract price more than twenty per cent in excess of the original contract price without notice to the surety, then, this obligation to be void, otherwise to remain in full force and virtue."

[3]. The condition of the Payment Bond reads:
"Now, therefore, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, except that no change will be made which increases the total contract price more than twenty per cent in excess of the original contract price without notice to the surety, then this obligation to be void, otherwise to remain in full force and virtue."

by I.C. § 45–502; [4] also against respondents (defendants) Associated and Thaxton, as additional sub-contractors and claimants under the contract and bonds, for materials and supplies furnished in constructing the hospital.

Respondents Associated and Thaxton, as sub-contractors, creditors of Krieger, answering the complaint, pleaded their in claims against Krieger, and against American Casualty on the payment bond.

Appellant Krieger answered, admitting $22,306.05 to be due and owing Detweiler on its claim, but denied liability on the ground that it had assigned all its assets to American Casualty and others as security for any amount that the Surety may owe under the sub-contracts; and that payment of such amounts thereby became the obligation of the Surety.

Appellant American Casualty by its amended answer denied liability in the premises and asserted that certain conduct of Detweiler, Associated and Thaxton barred their claims as against the Surety; and specifically alleged that Detweiler and Associated had accepted promissory notes from Krieger in payment of their claims under their sub-contracts and Krieger's prime contract with the County, and had executed affidavits to that effect on December 7 and December 8, 1960, respectively; that Thaxton had accepted Krieger's promissory note, executed December 15, 1960, in payment of his sub-contractor's claim under Krieger's prime contract. The Surety further alleged that such voluntary acts of respondents allowed Krieger to submit an affidavit to the Architect, and in turn to the County, for the purpose of obtaining the re-

4. I.C. § 45–502 provides that a contractor who contracts for the construction of a public work (in excess of $200) must, before commencing the work, furnish a bond in an amount equaling the amount of the contract price, "with the additional obligation that such contractor * * * shall promptly make payments to all persons supplying * * * labor or materials or supplies in the prosecution of the work provided for in the contract." This section further provides for publication of notice by the contracting public body of completion or abandonment of the contract, noticing anyone who has furnished labor, materials or supplies used in the work, payment for which has not been made, to file with the public body an itemized claim of amounts due and unpaid by the contractor; also requires the public body immediately to notify the surety that issued the bond, of the claims arising thereunder. The section also provides that any claimant shall have the right to intervene and be made a party to any action instituted by the public body on the contractor's bond, to the end that his claim be adjudicated; further, that if the public body does not institute such an action within ninety days after the completion or abandonment, then thereafter, within six months after the time of completion or abandonment, any claimant who has filed his claim may institute an action in the name of the public body against the contractor and his surety, and prosecute the action to final judgment and execution; provided that every other claimant who has filed a claim must be made a party to the action. The section also provides for allowance of attorneys' fees.

tainage held under the prime contract, on the ground that all claims of sub-contractors had been satisfied; that respondents knew that such acts on their part "would result" in payment of the retainage by the County; that the Surety was prejudiced by such acts due to the fact that the amounts so received as retainage "were not used to pay all of the obligations of said L. H. Krieger Construction Company arising from its contract with Minidoka County"; and finally, that respondents, by their acts, and the fact that the retainage was not used to pay all of the claims arising under the prime contract, were estopped from seeking recovery from the Surety under the payment bond.

The Surety also filed a third-party complaint against the County alleging that it (1) breached the terms of the prime contract with Krieger by failing to retain 10% of the contract price; and (2) failed to publish timely notice to creditors, in violation of I.C. § 45–502, as it regarded formal date of completion of the hospital to be November 10, 1960, but did not publish formal notice to creditors until February 9 and 16, 1961; that the Surety was prejudiced by such acts of the County, in prematurely releasing the retainage held under the terms of the prime contract and in failing to publish timely notice as required by law; that the Surety was exonerated of its obligations in the premises under the payment bond; and if not so exonerated

that, in the alternative, it have judgment against the County in reimbursement of all sums it, the Surety, may be compelled to pay under the bond.

The County in its answer to the Surety's third-party complaint defended on the grounds that the retainage was paid in compliance with the contract terms; that the provisions of I.C. § 45–502 are for the protection of laborers and materialmen only, and not for the benefit of surety companies on their bonds; also, that even if premature payment of retainage was found to have been made, the Surety was not thereby prejudiced, since the retainage was paid to Krieger, who used it first to pay debts owed under the prime contract and sub-contracts, before conveying his assets to the Surety for use in the payment of any additional claims; that the Surety, by accepting such assets, was estopped to deny its liability under the payment bond "and has waived its right, if any it had, to such discharge."

Detweiler, in an amendment to its complaint, alleged that on April 14, 1961, Krieger assigned all of its assets to the Surety and others "as security for any amount that the American Casualty Company might owe under this action," and that therefore American Casualty was estopped from asserting any defenses to the claims of Detweiler, Associated and Thaxton.

In a supplemental answer to Detweiler's amended complaint, the Surety admitted

taking assignment of Krieger's assets "as security for any obligations of American Casualty Company under its bond"; but denied the asserted estoppel for the reason that it had no knowledge of its defenses at the time of taking the assignment.

February 12, 1963, the trial court, after having considered the pleadings and records, including Krieger's deposition, admissions, interrogatories and answers thereto, and the statement of facts agreed to by all the parties to the action, granted respondent County's motion for summary judgment for the use and benefit of Detweiler, "on the basis that there are no remaining issues of material facts," and also granted like motions of respondents, Associated and Thaxton. The court also allowed the County to tender into court the sum of $6,670.28 as representing the remaining amount which the County owed under its prime contract with Krieger.

The court thereupon entered judgments against appellants in favor of the parties, i. e., Detweiler, Associated and Thaxton, for the amount of their claims together with interest, and for attorneys' fees as provided by I.C. § 45–502; also judgment in favor of the County and against all parties on all claims excepting as to the $6,670.28 tendered into court, adjudged to be proportionately disbursed to the judgment creditors, with credit proportionately to be given the judgment debtors on said judgments.

Certain facts agreed to by the parties include the following:

On July 1, 1959, L. H. Krieger Construction Co., by L. H. Krieger, an individual, as contractor, and respondent County, as Owner, entered into a contract for construction of a hospital building; the contract authorized 10% retainage by the County, and provided for final payment within 30 days after submission of the Architect's certificate of completion of the building, and upon delivery by the contractor to the County, of a release of all claims against the County arising under the prime contract and all sub-contracts. Acceptance of final payment by the contractor would operate to release the County of all liability to the contractor under the contract; but "No payments, however, final or otherwise, shall operate to release the Contractor or his sureties from any obligation under this contract or the Performance and Payment Bonds." Assignment by the contractor of any part of the contract or monies due or to become due thereunder would require the written consent of the County, and of the Surety executing any bonds on behalf of the contractor; and any instrument of assignment would provide that the rights of the assignee be subject to the terms of the contract, its amendments and supplements, and to the rights and

remedies of the County thereunder or arising by operation of law, and to the liens of all parties supplying services or materials in the performance of the contract.

July 1, 1959 the Surety issued the payment and performance bonds each in the amount of $329,632, wherein L. H. Krieger Construction Co., by L. H. Krieger was named as individual principal, and the County as obligee. The Surety issued its bonds on the basis of Krieger's indemnity agreement containing an assignment to the Surety of the contract balances "and upon the basis of * * * the contract executed for which said bonds were furnished between the county as owner and Krieger as contractor." Subsequently, Krieger Construction Company, Inc., was formed as a sole corporation, and the construction contract assigned to the corporation.

The County fixed final acceptance of the building as of November 10, with final payment to be made as of December 10, 1960. On November 29, 1960, a "change order", accepted by the contractor and the County, provided for additional installations recommended by the Architect.

December 6, 1960, Krieger, as contractor, wrote to the sub-contractors, Detweiler and Associated, stating that the County was accepting the building on December 10, 1960; that before final payment could be made by the County to the contractor, the County required the contractor, the sub-contractors and material suppliers to file affidavits and releases to the effect that all material, labor and other services in connection with the contracts and purchase orders for the construction of the building had been paid. Krieger then requested such an affidavit from each of said sub-contractors, stating it was necessary that he pay the amounts remaining on the sub-contracts by promissory notes payable in 60 days. Krieger enclosed such a note "in payment of the balance due", and requested that an affidavit, enclosed, be executed and returned promptly. He then stated "failure to accept this note as payment will only serve to delay our final payment from the owner [County] and our payment to you."

Krieger's promissory note to Detweiler, which it retained, was in the amount of $22,014.01, dated December 6, 1960, payable in 60 days without interest. The affidavit, executed and mailed to Krieger on December 7, 1960, required George H. Detweiler, representing the Detweiler firm, to state that Detweiler had been paid for all labor, materials and supplies furnished as

subcontractor under the Krieger contract with the County.

Krieger's promissory note to Associated, which it retained, was in the amount of $4,002.00, dated December 6, 1960, payable in 60 days without interest. Associated caused to be executed in its behalf a like form of affidavit and mailed it to Krieger on December 8, 1960.

December 6, 1960, Krieger delivered to the Architect an "affidavit on behalf of sub-contractors, materialmen and laborers" in similar form as the one executed by Detweiler.

December 8, 1960, the Architect certified on a performance estimate that the retainage on the prime contract amounted to $69,243.86, which estimate the Architect transmitted to the County together with the affidavit of Krieger, prime contractor, which Krieger had transmitted December 6, to the effect that all bills incurred on the project had been paid.

December 12, 1960, the County paid Krieger the sum of $69,243.86, being the 10% retainage from the contract price.

December 15, 1960, Krieger delivered its promissory note to Thaxton, prepared and furnished by Thaxton, in the amount of $1,251.00, payable March 13, 1961, which note Thaxton retained.

November 10, 1960, the Surety addressed a general status inquiry to the County, concerning the contract; the County replied December 13, 1960, to the effect that the approximate date of acceptance of the work was November 10, 1960, and of completion, December 12, 1960.

Thaxton and Associated completed their sub-contracts prior to December 1, 1960 and January 11, 1961, respectively. Detweiler continued work under its sub-contract until in February, 1961.

January 23, 1961, Krieger authorized the County to deliver all moneys due under the contract to the Surety; at that time the Surety's attorneys also requested the County to advise them the date of publication and date of acceptance under the contract as required to be published under I.C. § 45–502.

The County caused to be published in a newspaper of general circulation in the county, on February 9 and February 16, 1961, a notice to claimants as required by I.C. § 45–502, wherein December 12, 1960, was stated as the date of completion of the work under the Krieger contract, and requiring parties who furnished labor, materials or supplies used in the work, for which payment had not been made, to present their claims to the County within 90

days of the date of completion; that failure so to do would constitute a waiver against the Surety.

Detweiler filed its claim February 16, 1961, for $22,047.88 which it later amended to the sum of $22,306.05. Associated filed its claim February 23, 1961, for $5,027.00, stating a portion was for materials and labor furnished on January 11, 1961. Thaxton filed its claim March 3, 1961, for $1,251.60.

February 17, 1961, the Architect made final estimate showing the balance then due under the contract to be $6,067.29, which sum the County tendered and paid into court.

February 17, 1961, the Architect certified that the hospital project was completed.

March 20, 1961, the County mailed to the Surety's attorneys a letter certifying that on December 12, 1960, the County had paid to Krieger the sum of $69,243.86.

April 14, 1961, Krieger individually and the Krieger Corporation assigned assets to the Surety as security for any obligations of the Surety under its bonds.

Detweiler, Associated and Thaxton had received no moneys on their claims at the time of commencement of the present action.

Appellants, by their assignments, contend that the trial court erred in granting the various motions for summary judgments and in entering the summary judgments as a matter of law against appellants, in favor of the County, and in favor of Detweiler, Associated and Thaxton on their claims; in failing to grant summary judgment to appellants "under the law and facts"; and in determining that "there was no remaining issue of fact."

Respondents must be separated into two classes. The first class is comprised of respondents Detweiler, Associated and Thaxton, who seek satisfaction of their claims for labor, materials and supplies furnished by them in the construction of the hospital building. The second class consists solely of respondent County (Owner), the obligee under the bonds furnished by appellant American Casualty.

The only statutory protection now afforded laborers and materialmen for labor, materials and supplies furnished for the construction of public works, is that given by I.C. § 45–502. People v. Storm, 49 Idaho 246, 287 P. 689 (1930).

Laws like or similar to I.C. § 45–502 are considered highly remedial and, in effectuation of their purposes, are to be liberally construed in favor of labor and materialmen. Rogers v. County of Nez Perce, 83 Idaho 467, 364 P.2d 1049 (1961); State ex rel. Modern Motor Co. v. H & K Con-

struction Company, 75 Idaho 492, 274 P.2d 1002 (1954); People v. Storm, supra; for discussion of the comparable federal legislation, commonly known as the Miller Act, 40 U.S.C.A. § 270a et seq., (1935), as to its remedial aspects, see United States v. James Stewart Company, 195 F.Supp. 715 (D.C.Idaho 1961); MacEvoy v. United States, 322 U.S. 102, 64 S.Ct. 690, 88 L.Ed. 1163 (1944).

*Appellants' Specifications of Error as Regards Detweiler, Associated and Thaxton.*

Appellants' assignments of error present the question whether the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c); Anderton v. Waddell, 86 Idaho 220, 384 P.2d 675 (1963); Jack v. Fillmore, 85 Idaho 36, 375 P.2d 321 (1962); Sutton v. Brown, 85 Idaho 104, 375 P.2d 990 (1962); Merrill v. Duffy Reed Construction Co., 82 Idaho 410, 353 P.2d 657 (1960).

 A compensated surety must show prejudice or injury when there has been a material alteration of the suretyship contract. Ore-Ida Potato Products, Inc. v. United Pacific Insurance Company, 87 Idaho 185, 392 P.2d 191 (1964).

Appellants alleged that Krieger gave its promissory notes to respondents Detweiler, Associated and Thaxton in payment of debts; but respondents refute that contention and claim that they accepted the notes as collateral security. Appellants claim that thereby a genuine issue of material fact was presented.

 Appellants contend that respondents accepted the notes as absolute payment and not as collateral security or as mere evidence of the debts. Such a presumption is not shared by the weight of authority, especially when statutory liens are involved. See Distefano v. Hall, 218 A.C.A. 683. 32 Cal.Rptr. 770 (1963); Diskin v. City of Philadelphia Police Pension F. Ass'n, 367 Pa. 273, 80 A.2d 850 (1951); McRae Grocery Co. v. Independence Indemnity Co., 33 F.2d 494(4th Cir. 1929); 32 Cal.Jur.2d, Payment § 17 (1957); 70 C.J.S. Payment § 104 a (1951). Appellants' further contention that they were thereby prejudiced is not sustained by the facts disclosed by the record.

The record indicates that Krieger executed its promissory notes in exchange for respondents' affidavits, in order to obtain payment of the retainage held by the County. The purpose in obtaining the retainage is set out in Krieger's letter of December 6, 1960, to respondents, Detweiler and Associated:

"Due to the large amount of retainage held on our contract with owner it is necessary for us to pay the amount

retained on your contract with us by a promissory note, due and payable without interest in 60 days from date of note.

"*Failure to accept this note in payment will only serve to delay* the final payment from the owner and *our payment to you.*" (Emphasis supplied.)

L. H. Krieger, in his deposition, admitted that he caused to be paid some of Krieger's creditors on jobs in addition to the county hospital project with funds received from the County, and then discussed why he caused assignment of Krieger's assets to appellant, American Casualty Company, and to Columbia Casualty Company, to be held in trust for the payment of any further claims found to be owing.

"Q. The payment from Minidoka County of $69,000 plus, what disposition was made of those funds?

"A. That amount of money was to our general account and bills were paid.

"Q. In other words, you paid your creditors with those monies?

"A. Yes, * * * at that time we had several jobs going and we don't keep a separate account for separate jobs.

"Q. Then since you co-mingled your funds in your bank account you paid creditors both of the Minidoka County Hospital job as well as other jobs, and the sureties on these various jobs were both Columbia [Casualty Company] and American [Casualty Company]; is that correct?

"A. Yes, correct.

\* \* \* \* \* \*

"A. * * * when I started to get in trouble I called in the bonding companies, and of course, there just wasn't enough funds left. They tied up my funds and assets so I couldn't pay off the others that were still outstanding, with Associated Specialties, with Thaxton Paint, and with Detweilers [respondents]—

\* \* \* \* \* \*

"A. * * * it was my intention when I called both bonding companies in I wanted all of these bills paid.

\* \* \* \* \* \*

"A. * * * I had nothing else in my mind to do but pay these people and this money I don't deny at all. It is owing these people and I want to pay it."

In answer to further questions propounded, Mr. Krieger admitted that, while he did not know the total amount of claims outstanding against him (and Krieger Corporation), the value of the real property which Krieger assigned to appellant and Columbia Casualty Company in trust was of the value of some $66,500.00 less encumbrances, and the personal property approximated $13,000.00. Accepting the undisputed figures submitted, the record shows that the property so re-

**410**

ceived by the Surety through the assignment was sufficient to satisfy respondents' outstanding claims, after deducting encumbrances and miscellaneous expense items.

■ In aid of their argument that respondents accepted the notes in satisfaction of the debts owed under their sub-contracts, which respondents denied, appellants additionally contend that respondents are estopped from asserting their claims because they aided Krieger in obtaining payment of the retainage held by the County by executing affidavits to the effect that their claims had been paid. (Thaxton did not execute such an affidavit, but agreed to inform the county clerk that he, Thaxton, did not object to the release of the retainage, inasmuch as he had obtained Krieger's promissory note as evidence of its, debt). Appellants' contention is not supported by the agreed facts or applicable principles of law.

The agreed facts show that on December 6, 1960, Krieger enclosed its promissory notes to Detweiler and Associated, and requested their affidavits in return. Detweiler executed and mailed its affidavit to Krieger on December 7, 1960; and Associated, December 8, 1960. On December 6, 1960, Krieger, without having received the requested affidavits from Detweiler and Associated, executed and delivered to the Architect in charge of the hospital project an "Affidavit on Behalf of Sub-Contractor, Materialmen or Laborer" which stated that there were no "unpaid claims or demands of sub-contractors, materialmen, mechanics, laborers or any others" arising out of their contracts and Krieger's prime contract with the County. The sworn affidavits on behalf of Detweiler and Associated were, in fact, never received by the County prior to its release and payment to Krieger of the retainage.

■ In Fairchild v. Wiggins, 85 Idaho 402, 380 P.2d 6 (1963), quoting from Little v. Bergdahl Oil Co., 60 Idaho 662, 95 P.2d 833 (1939), this Court once again stated the elements necessary to constitute estoppel:

"To constitute an estoppel it must be shown there was a false representation or concealment of a material fact; that it was made with knowledge, either actual or constructive, of the facts; that the party to whom the false representation was made was without knowledge or the means of acquiring knowledge of the real facts; that the false representation was made with the intention that it should be acted upon and the party to whom it was made must have *relied on it or acted upon it to his prejudice.*" (Emphasis supplied.) 85 Idaho at 406, 380 P.2d at 8.

The facts show that appellants' defense of estoppel cannot be successfully urged, inasmuch as the affidavits of respondents, Detweiler and Associated, were not relied

on by either Krieger or the County to their prejudice or detriment. Appellants assert, "It is sheer nonsense * * * to suggest that merely because one affidavit predates another, that Krieger was not relying upon the conduct of claimants [respondents] and their understanding that notes were satisfactory payment of their claims for all purposes * * *." This Court, however, is constrained to the view that Krieger sought payment of the retainage in order to satisfy respondents' claims. Such is shown by the above-quoted portion of his letter of December 6, 1960, and the statement of Mr. Krieger in his deposition, that it was his intention to pay respondents from the retainage, after securing their affidavits, because he had nothing else in mind "but pay these people."

Appellants' allegation in the amended answer that such acts on respondents' part in executing affidavits "would result" in payment of the retainage by the County does not necessarily follow. The decision to release the retainage was that of the County alone, acting within its own discretion. Appellants cannot successfully assert that respondents were estopped to assert their claims.

▮ Appellants next contend that respondents, by executing the affidavits, elected to rely upon Krieger's personal credit and waived their lien rights under I.C. § 45–502 against the Surety on its payment bond. Such contention is founded on the premise that respondents accepted Krieger's notes in full and complete payment of their claims. Respondents maintain, however, that they accepted the notes as collateral security; moreover as hereinbefore pointed out, the record indicates that Krieger's main purpose in obtaining the retainage was to satisfy respondents' claims.

▮ A waiver is the intentional and voluntary relinquishment of a known right. Grover v. Idaho Public Utilities Commission, 83 Idaho 351, 364 P.2d 167 (1961); Crouch v. Bischoff, 78 Idaho 364, 304 P.2d 646 (1956). The presumption attains that in the absence of an affirmative showing, a note is not taken in extinguishment of an antecedent debt but as mere evidence of it. As clearly set out in 38 Cal.Jur.2d Payment, supra, at 256, 257:

"The giving or taking of a note, draft, or other commercial paper, either of the debtor or of a third person, for an antecedent debt, does not operate as an extinguishment of the debt unless such paper is given and accepted under an agreement that it constitutes payment. In the case of a note, the presumption is against its being taken in payment of the pre-existing debt. That it was so accepted must be affirmatively shown. This is so because the note is merely an evidence of an existing indebtedness and does not

change the amount or character of the liability.

"The acceptance of a note merely as evidence of a debt, and not as payment does not constitute a waiver of any lien rights the creditor may have."

Furthermore, insofar as respondent Associated is concerned, the record shows that Krieger partially fulfilled his purpose in obtaining payment of the retainage by sending Associated a check, on or about January 10, 1961, in partial satisfaction of its claim. Upon its receipt, Associated returned Krieger's promissory note, although Associated subsequently was unable to cash the check since its payment was "interfered" with, according to a statement contained in a letter dated January 19, 1961, by appellants' counsel to Associated.

 We agree with respondents' contention that premature payment of retainage, if premature, does not, ipso facto, have the effect of releasing the Surety as against third-party creditor beneficiaries. Indeed, the cases cited by appellant Surety, for the purpose of refuting this contention, are not concerned with the rights of labor and materialmen, as regards their claims against the Surety, but only with the Surety's right of redress against the obligee under the bond for premature release of contract funds. See, e. g., Ft. Worth Independent School Dist. v. Aetna C. & S. Co., 48 F.2d 1, 77 A.L.R. 222 (5th Cir.), cert. denied 284

U.S. 645, 52 S.Ct. 24, 76 L.Ed. 548 (1931). Appellants' citation of Texas authority is also not in point since, while at one time Texas made no distinction between gratuitous and compensated sureties as regards the necessity of showing prejudice, Annot., 127 A.L.R. 10, 11 (1940), the rule now attains in that jurisdiction that a compensated surety must prove prejudice in order to be relieved of its obligations in the premises. Old Colony Insurance Company v. City of Quitman, 163 Tex. 144, 352 S.W.2d 452 (1962).

In Ardsley, Inc. v. United Pacific Insurance Company, 74 Nev. 377, 332 P.2d 1000 (1958), certain materialmen and sub-contractors sued to foreclose their lien rights for labor and materials supplied, the obligee under the construction contract having made the surety company a defendant in a third-party proceeding. The surety had provided the builder with a surety bond almost identical in its terms to the payment bond in the case at bar. The terms of the prime contract between the builder and the owner obligee called for deposit of $20,000 in escrow of which $6,019.65 was disbursed by the obligee prematurely and contrary to the escrow agreement. The Supreme Court of Nevada discussed the action taken by the trial court and the applicable law as follows:

"The trial court ruled that premature payment of the sum of $6,019.65, con-

trary to the terms of the construction contract, constituted a material variance of the terms of the contract and held the same to be a pro tanto exoneration of the surety's obligation.

"It is conceded that the sums so prematurely paid were owed by the builder upon the contract in question. Under the terms of the surety bond the builder's obligation to pay these claims became the obligation of the surety upon the builder's default. Acoustics, Inc. v. American Surety Co., 74 Nev. 6, 320 P.2d 626. Had the claims not been paid out of escrow the surety would have eventually had to pay them. The surety was not, then, prejudiced by the fact that payment was premature. There being no prejudice to the surety resulting from the owner's breach, that breach will not release the surety." 332 P.2d at 1001.

That analysis by the Nevada Supreme Court of the surety's liability to third-party beneficiaries, where there is premature payment of funds by the obligee to the builder under the prime contract, is also fully discussed and approved in the authoritative decision, Corporation of President of Church of Latter-Day Saints v. Hartford Acc. Etc., Co., 98 Utah 297, 95 P.2d 736 (1939); see also Hochever v. Maryland Casualty Co., 114 F.2d 948 (6th Cir.1940); Maryland Casualty Co. v. Portland Const. Co., 71 F.2d 658 (2nd Cir.1934) (L. Hand, J.); Cushman, Surety Bonds on Public and Private Construction Projects, 46 A.B.A.J. 649 (June 1960); 72 C.J.S. Principal and Surety, § 133 (1951); Annot., 77 A.L.R. 229 (1932).

Appellants contend that the trial court erred in granting summary judgment against Krieger personally on the ground that his original obligations with respondents were those of Krieger Construction Co., Inc., of which he, Krieger, was a stockholder. The agreed facts and Krieger's statements in his deposition refute this contention.

Agreed Facts:

"On July 1st, 1959, L. H. Krieger Construction Co. by L. H. Krieger, as contractor and an individual, entered into a contract in writing with Minidoka County, Idaho, * * * as the owner, for the construction of a hospital.

"On the application of L. H. Krieger, American Casualty Company * * * issued on July 1st, 1959, its payment and performance bonds in the amount of $329,632.00 each wherein L. H. Krieger Construction Co., by L. H. Krieger, was the individual principal.

"Subsequent to the contract date, Krieger Construction Company, Inc., was formed as a sole corporation and

the construction contract was allegedly assigned to the corporation."

L. H. Krieger's Deposition:

"Q. You entered into the contract [with Minidoka County] as an individual and later assigned it to the corporation? A. Right.

"Q. The bond * * * was issued by the American Casualty Company, that is the payment bond and also the performance bond was issued in your name individually; is that correct?

"A. I believe that is correct, yes.

"Q. * * * the corporation and you individually both guaranteed the bond?

"A. Right, first as a company and later as a corporation.

"Q. Was this corporation formed after the contract of Minidoka County was entered into July 1, 1959? A. Yes."

The record does not show that the County ever consented to the assignment of the construction contract by L. H. Krieger as an individual to L. H. Krieger Construction Company, Inc., or released Krieger individually. Mr. Krieger could not delegate his personal obligations under the original contract with the County without first obtaining its consent; hence, the trial court was correct in granting summary judgments against him personally.

■ We deem our treatment of the subject matter of waiver, particularly dealing with events subsequent to Krieger's acquisition of the retainage and his attempt partially to satisfy the claims of respondent, Associated, as sufficiently answering appellant Surety's allegation in its supplemental answer, that it had no knowledge of its defenses against the claims of respondents, at the time it acquired Krieger's assets in trust during April, 1961. It is also pointed out, in determining that issue, that the County was under no duty to disclose to appellant Surety that it had released the retainage funds to Krieger, since under the bonds, issued by the Surety, no such disclosure was required. See Peachtree Roxboro Corp. v. United States Cas. Co., 101 Ga.App. 340, 114 S.E.2d 49 (1960).

Our review of the record, and applicable principles of law, leads to the conclusion that the trial court, as a matter of law, correctly granted the motions of respondents, Detweiler, Associated and Thaxton, for summary judgments against appellants, L. H. Krieger and American Casualty, there being no genuine issue of material fact presented.

*Appellants' Specifications of Error as Regards Respondent, County.*

Appellant American Casualty contends that the County released the retainage funds prematurely, in contravention of the specific terms of its contract with Krieger.

It argues that, as a matter of law, premature release of retainage by an obligee under a construction contract discharges the obligations of a compensated surety, and entitles it to recover from the obligee any amounts it, the Surety, may have been compelled to pay under the bonds.

Ore-Ida Potato Products, Inc. v. United Pacific Insurance Company, supra, precludes the approval of such contention, since the discussion contained in that case regarding the necessity of a showing of prejudice by a compensated surety is of equal force and effect in the case at bar. As clearly set forth in the comprehensive annotation, 127 A.L.R. 10 (1940):

"* * * the common-law rule of strictissimi juris has been greatly relaxed as regards the rights and liabilities of corporate sureties acting for compensation. There is at the present day almost no dissent from the view that a departure from the terms of a construction contract with respect to payments will not have the effect of discharging a compensated surety on the contractor's bond, unless it appears that such departure has resulted in injury, loss, or prejudice to the surety.

"In accordance with this general rule, the great weight of authority supports the view that such an unauthorized payment has the effect of releasing a compensated surety only pro tanto, *to the extent of the injury or prejudice suffered by the surety, and not necessarily to the full extent of the surety's obligation.*" (Emphasis supplied.) Supra at 62, 69.

See also Corporation of President of Church of Latter-Day Saints v. Hartford Acc., Etc., Co., supra; also the numerous citations appearing at page 69 of the above A.L.R. annotation.

As regards the contract itself, the County asserts that the retainage was properly paid in compliance with clause 30(d) [5] of the "general conditions of the contract" and not with clause 30(f) [6] thereof, which

---

5. Clause 30(d) reads:
"(d) Release of Claims.—Neither the final payment nor any part of the retained percentage shall become due until the Contractor shall deliver to the Owner through the Architect a complete release of all claims against the Owner arising under and by virtue of this contract, including claims of all sub-contractors and suppliers of either materials or labor, other than such claims, if any, as may be specifically excepted by the Contractor."

6. Clause 30(f) reads:
"(f) Final payments.—Within thirty (30) days after the filing of such certificate of completion, the Owner shall pay the Contractor the amount therein stated, less all prior payments and advances whatsoever to or for the account of the Contractor. All prior estimates and payments including those relating to extra work shall be subject to correction by this payment, which is throughout this contract called Final Payment."

is concerned with final payment of moneys still owed by the obligee. Appellant surety, on the other hand, contends that clause 30(d) merely imposed an additional condition to be satisfied before the retainage could be released; and that the conditions in clauses 30(d) and 30(f) had to be satisfied before any release of funds could be made. The Surety also contends that the County ignored clause 30(b) [7] which required a 10% retainage of contract funds until acceptance of all work covered by the contract; that the County also ignored clause 30(e) [8] which, upon acceptance of the work, required the Architect's certificate as to the amount of work performed and compensation earned.

This Court has consistently held that it cannot make the contract for the parties, Miller v. Remior, 86 Idaho 121, 383 P.2d 596 (1963); Taysom v. Taysom, 82 Idaho 58, 349 P.2d 556 (1960); and that it is only when interpretation of ambiguous terms of a contract is required, are questions of fact presented for determination. National Produce Distributors v. Miles & Meyer, Inc., 75 Idaho 460, 274 P.2d 831 (1954); Shipman v. Kloppenburg,

72 Idaho 321, 240 P.2d 1151 (1952). National Produce Distributors v. Miles & Meyer, Inc., supra, enunciated however the rule which we deem applicable herein, as follows:

" * * * on the other hand, where a contract is clear and unambiguous, not involving any absurdities or contradictions, it is the best evidence of the intent of the parties and hence a determination of its meaning and its legal effect are a question of law for determination by the court. [Citations.]" 75 Idaho at 465, 274 P.2d at 833.

See also Read v. Downey State Bank, 87 Idaho 314, 392 P.2d 681 (1964); 12 Am.Jur., Contracts, § 227 at 745, and § 229 at 751 (1938). "The determination of the meaning and legal effect of such a contract is for the court alone." Molyneux v. Twin Falls Canal Co., 54 Idaho 619, 35 P.2d 651, 94 A.L.R. 1264 (1934).

The County maintains, even if the retainage payment was premature and a departure from the contract, that appellant Surety was not discharged from its obligation under the surety bonds in view

---

7. Clause 30(b) reads:
 "(b) In making such partial payment there shall be retained ten percent (10%) on the estimated amount until final completion and acceptance of all work covered by the contract."

8. Clause 30(e) reads:
 "(e) Certificate of Completion—Upon completion and acceptance of all work

whatsoever required, and the release of all claims against the owner as specified, the Architect shall file a written certificate with the Owner and with the Contractor as to the entire amount of such work performed and compensation earned by the Contractor including extra work and compensation therefor."

of clause 30(g) [9] the last sentence of which provides, "No payments, however, final or otherwise, shall operate to release the Contractor or his sureties from any obligations under the contract or the Performance and Payment Bonds." Such language in a construction contract has been held to refer only to the character of work to be done by the prime contractor and not to the provision requiring retention of a certain percentage of the contract funds. Village of Chester v. Leonard, 68 Conn. 495, 37 A. 397 (1897). It has also been construed as preventing discharge of the surety's obligations under the bond, Zang v. Hubbard Building & Realty Co., 125 S.W. 85 (Tex.Civ.App.1910), and as amounting to a waiver in advance of the defense by the surety that payments were not made at the times and in the manner provided by the contract. Enterprise Hotel Co. v. Book, 48 Or. 58, 85 P. 333 (1908).

The record on appeal in this cause contains the prime or original contract agreement between the County and Krieger, of July 1, 1959; also excerpts of the "general conditions of the contract" under which the work was to be performed,

made a part of the contract by reference, and portions of which are set forth in the statement of "agreed facts", and in the footnotes herein. We are mindful of the rule in construing a written instrument to determine what is intended by it, the Court will examine the whole instrument, Molyneux v. Twin Falls Canal Co., supra; Bratton v. Morris, 54 Idaho 743, 37 P.2d 1097 (1934); and that the instrument must be enforced according to the plain import of its terms where the language is clear and not involving absurdity or contradiction. Scharbach v. Continental Casualty Company, 83 Idaho 589, 366 P.2d 826 (1961); J. R. Simplot Co. v. Chambers, 82 Idaho 104, 350 P.2d 211 (1960); McCallum v. Campbell-Simpson Motor Co., 82 Idaho 160, 349 P.2d 986 (1960); Molyneux v. Twin Falls Canal Co., supra; Bratton v. Morris, supra.

Here, all of the "general conditions of the contract", under which the work was to be performed, are not made a part of the record on appeal, but certain clauses thereof have been included in the "agreed facts". The language of the general contract and those work condi-

---

9. Clause 30(g) reads:

"(g) Acceptance of Final Payment Constitutes Release. The acceptance by the Contractor of the Final Payment shall be and shall operate as a release to the Owner of all claims and of all liability to the Contractor for all things done or furnished in connection with this work and for every act and neglect of the

Owner and others relating to or arising out of this work, excepting the Contractor's Claims for interest upon the Final Payment, if this payment be improperly delayed. No payments, however, final or otherwise, shall operate to release the Contractor or his sureties from any obligations under this contract or the Performance and Payments Bonds."

tions made a part thereof appear to be clear and uncontradictory. Moreover the "agreed facts" show that a basis, upon which the Surety issued its bonds was "the contract executed for which said bonds were furnished between the County as Owner and Krieger, as Contractor."

The language of the last sentence of clause 30(g) of the general conditions of the contract under which the work was to be performed *has application to the entire contract* and all the obligations thereunder of the contractor or his sureties. The clause specifically states that *"No payment, however, final or otherwise, shall* operate to *release the Contractor or his sureties from any obligations under this contract or the Performance and Payment Bonds."* (Emphasis supplied.)

By reason of the agreed facts, and interpretation of the contract being considered as a question of law, the trial court's determination that there was no remaining genuine issue of material fact is manifestly correct.

The summary judgments entered in favor of respondents, Detweiler, Associated and Thaxton, are affirmed. Those respondents have filed their motions for allowance of reasonable attorneys' fees for services rendered on the appeals to this Court. Pursuant to the motions and authority of I.C. § 45–502, respondents are hereby allowed reasonable attorneys' fees on the appeals to be incorporated upon remittitur in the judgments rendered in their favor as follows: Detweiler Bros., Inc., $1500.00; Associated Specialties Co., a corporation, $500.00; and Alfred Thaxton d/b/a under the firm name and style of Thaxton Painting Company, $250.00.

The summary judgment in favor of respondent County is affirmed.

Costs awarded to respondents.

KNUDSON, C. J., and McQUADE, McFADDEN and TAYLOR, JJ., concur.

On Rehearing

SMITH, Justice.

We have again examined I.C. § 45–502, which requires indemnification of public and quasi-public bodies on contracted work which exceeds $200.00, by bond equaling the full amount of the contract price, the bond to contain the additional obligation that the contractor shall promptly make payment to all persons supplying material and labor in the prosecution of the contracted work. The bond is furnished for the benefit of the public body, to guarantee performance by the contractor of the work contracted. The statute does not provide for any amount to be retained by the public body from amounts earned by the contractor as the work progresses; but, if an amount is retained by contract, as in the case at bar, such likewise is intended as an additional guarantee for the performance of the contracted work.

Simply stated the statute contemplates that if the contractor fails to perform the work contracted, for the performance of which the statute requires a bond to be given in a sum equaling the full amount of the contract price, then the surety, under the obligations of the required bond, must provide performance of the contracted work. The surety in such a case is required to step into the shoes of the contractor; the surety to perform as the contractor originally agreed to do.

Appellant American Surety Company on rehearing of this cause again presented the issue whether respondent Minidoka County must respond to the surety by reason of the County having paid to Krieger, the prime contractor, retainage funds amounting to $69,243.86 which, the surety states, were by the County "contracted to be retained upon the contract".

The prime contractor, Krieger, contracted to construct the County's hospital building for the sum of $629,246.00. The architect's performance estimate of December 8, 1960, submitted to the County showed $69,122.60 additional work authorized under the contract. The total work contracted amounted to $698,386.60. All of the work contracted under the original contract had been completed, and all of the additional work had been completed except only $5,948.03 thereof, and the architect so certified. On December 8, 1960, the architect additionally certified that $69,-243.86 as retained percentage was currently due to Krieger, who had presented a showing to the County to the effect that his subcontractors had been paid. The only work subsequently authorized as an addition to the contract amounted to $722.-25.

The work required by the original contract and by the authorized addition to the contract had been substantially completed as of December 18, 1960. Nothing in the record indicates that the County's payment of the retainage involved any bad faith on the part of the architect, the County or its board of county commissioners.

Graybar Electric Co. v. Manufacturers Cas. Co., 37 N.J.Super. 284, 117 A.2d 196 (1955) and 21 N.J. 517, 122 A.2d 624 (1956), involved a performance bond executed by the Manufacturers Casualty and Insurance Company in favor of the Board of Education of Plainfield, New Jersey, for the performance by N. R. Epstein Electric Company of contracted work on the electrical system of a certain school. The contract provided that the Board should make monthly payments to the contractor based upon 90% of the estimated completed work at the end of each month, as certified by the Engineer, and that payment of the retained percentage should be made 60 days after final date of acceptance. The Board omitted to retain the 10% retainage but made full payment to Epstein, the contractor, before the date of final acceptance of

the work by the Engineer. Epstein became bankrupt. Graybar Electric Co., which had not been paid for material furnished to the contractor, brought an action on its claim, against the Board and the insurance company.

The insurance company asserted that the retained percentage was for the benefit of the Board, as well as the lien claimants and the surety. It pointed out if the Board had not made the final payment, the retainage would have been available for the indemnification of the surety.

Both the superior court and the Supreme Court of New Jersey pointed out that the performance bond contained the provision, required by the New Jersey statute, that "no modifications, omissions or additions in or to the terms of the said contract or in or to the plans or specifications therefor shall in anywise affect the obligation of said surety on its bond". The superior court, 117 A.2d 196, at 201, stated:

> "That form [of bond] evidences a legislative intent to make the bonding company absolutely liable for the penal sum of the bond no matter what alteration, omission or addition the board and the contractor may make in or to the terms of the contract."

The Supreme Court upheld such construction.

In the case at bar the performance bond furnished by the contractor in favor of the public body is required by I.C. § 45-502. Although specific phraseology of the performance bond is not set forth by statute, such bond, as in the Graybar Electric Co. case, covered all of the undertakings, covenants, terms, conditions and agreements of the prima contract as well as any and all authorized modifications of said contract. (See Footnote 2, Original Opinion.) Although Minidoka County paid Krieger the retainage as of a time prior to formal acceptance of all of the contracted work, nevertheless under such broad phraseology, the surety must "be held liable without recourse against the public agency"; Graybar Electric Co. v. Manufacturers Cas. Co., supra, 122 A.2d 624, at 626.

American surety again stresses its lack of notice before the County made payment of the retained percentage to Krieger.

In the original opinion this Court pointed out that the surety was not entitled to notice because the bonds do not so require. Peachtree Roxboro Corp. v. United States Cas. Co., 101 Ga.App. 340, 114 S.E.2d 49 (1960). See also Bekins Moving & Storage Co. v. Maryland Cas. Co., 72 Idaho 493, 244 P.2d 1100 (1952), which quoted with approval from the syllabus of Corporation of President of Church of Jesus Christ of Latter-Day Saints v. Hartford Acc. Etc. Co., 98 Utah 297, 95 P.2d 736 (1939), which reads:

> "A surety on a building contractor's bond is not entitled to notice of con-

tractor's default, unless bond specifically provides therefor.

This Court ruled that such holding, among others, was pertinent and controlling in the Bekins case, stating: "It will be noted that the contract and bond herein [Bekins case] did not require notice of the contractor's default."

The surety asserts that a duty rested upon the County to see that the money retained was applied by Krieger, the prime contractor, in payment of Krieger's subcontractors. We are unable to entertain such view simply because the privity of contract existed between the County and Krieger, the prime contractor, and not between the County and the subcontractors. Moreover Krieger had furnished the County with requisite security required by law to insure the County in case of Krieger's default, in which event the surety was obligated to provide performance in his place and stead.

We again point to I.R.C.P. Rule 56(e) which provides:

"* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of his pleading, but must answer in detail as specific as that of the moving papers, setting forth the material facts as he believes and intends to prove them to be. If he does not so answer under oath, summary judgment shall be entered against him."

The record shows that the County's motion for summary judgment was based upon the pleadings, interrogatories and answers thereto, depositions, records and files in the cause. None of the matters which counsel for the surety have submitted on the petition for rehearing, as alleged facts in affidavit form, were presented at the hearing on motion for summary judgment, at which time the trial court inquired of the surety's counsel if the surety had anything to offer in addition to the records and exhibits. Counsel replied in the negative, excepting in case of an appeal, that the record be clarified by identification of exhibits, to which opposing counsel registered no objection.

The motions for summary judgment were not refuted by the surety as contemplated by I.R.C.P. Rule 56(e). The motions were heard nearly six weeks after the County filed its motion for summary judgment, which afforded the surety ample time to file counter affidavits or any other showing in contest of the motion, had it desired so to do.

While the surety generally alleges prejudice in its pleadings, it attempted to support such allegation in the form of affidavits supporting its petition for rehearing herein, some 18 months after the lower

court entered judgment. It thus attempted to raise questions of fact by a method not within the purview of I.R.C.P. Rule 56(e).

We adhere to the original opinion filed in this cause July 16, 1964.

McQUADE, and McFADDEN, TAYLOR and KNUDSON, JJ., concur.